The argument is 15-1902 Intendis v. Glenmark. Mr. Jay, good morning. Good morning. May it please the Court, William Jay for the Glenmark appellants. Bayer sought to extend the life of its azelaic acid franchise by getting a patent on a formulation that encompassed only a very specific combination of excipients. It could not have patented azelaic acid. It could not even have patented an azelaic acid hydrogel because the art knew those. So it told the world that its innovation was this very specific combination of excipients. Glenmark set out to make a different combination, one that did not meet the claims, did not literally infringe. And the district court nonetheless held that Glenmark's different formulation infringes by equivalence. And it used reasoning that gave Bayer a much broader range of equivalence than it has a right to. Can I ask you just one threshold question, which is a process question? There's documents marked that deal with the and of your client. There are documents in the joint appendix that are marked confidential. But it appears to me, at least, when we're talking about what representations were made by your client before the FDA, the district court actually referred to some of those in her opinion, which I think is public information. So is it clear for purposes of our discussion here, can we talk about that or not? I believe that we can talk about what the district court talked about here in open court. That's correct. Sorry to interrupt. Thank you. I should note that the and of is still pending. The district court's reasoning rested on three- But the representations haven't changed, right? No. The district court's holding rests on three separate legal errors. One about the function way result test. The district court allowed Bayer to benefit from a theory of what function lecithin and triglycerides perform that appears- The patent doesn't actually ever tell you, certainly not expressly, at most a tiny inference, but what the actual function of lecithin and triglycerides are in this composition. The patent is just radio silent on it. We think that there is a suggestion, as Your Honor alluded to in column two, we think that the prosecution history actually sheds more light on that, suggesting that it is exactly what Bayer would later tell the FDA it is, that lecithin is an emulsifier and triglycerides are an emollient. But it can be both an emulsifier and a skin penetrator. It's entirely possible it can serve both. It can serve both in the abstract and the question, the proper question is- And most of this patent, I mean to the extent that they talk about the advantages of this particular formulation, it's almost exclusively about the surprising advances of the skin penetration, up to three to five times more over Skinner and their product of their last iteration. Yes, Your Honor, but the district court correctly concluded that you can't get from the patent, specifically example two, which is what Bayer's expert tried to read to get penetration enhancer to connect it up to lecithin and triglycerides. You can't get that out of the patent. The district court was exactly right about that. Can I just, I mean, I guess, why does that matter? Do we really have doctrine in the doctrine of clueless that says the patent has to disclose the function, and in particular, if it doesn't do so at all, or not very clearly, that extrinsic evidence can't do that, including, most importantly, what the chief was referring to before, your own antiphon? Well, let me take that in two steps, if I may, because I think the answer to your question is yes, but you don't need to agree with me in order to rule for my client in this case, precisely because I think that, and this gets back to my colleague, Judge Moore, I think that there's more here that this patent actually teaches. Not only does it not say anything about function, it suggests that the function is something else, and the court's cases clearly do say that when the patent and the intrinsic record disclose one function, you can't make up another function for personal evasion. Okay, so where is your best evidence in the patent that lecithin functions as an emulsifier? I think it would be in column two, line 56. Is this the nano emulsion comment? Yes, it's the nano emulsion point. Okay, but really all this says is that at less than 1%, lecithin, you're not going to see nano emulsion, and that that's an advantage. I must be honest, I'm dying to know, I actually now know what nano emulsion is, but why do you not want it? Why do you not want a nano, why would the art not want a nano emulsion? Yeah, because it's listed as an advantage. At the concentration of 1%, it's an advantage not to have nano emulsion. Why is that? I think if you look at the district court's opinion on claim construction, you'll see the dispute between the parties was about, and this came up also in the dispute about what the prior art shows, where does a nano emulsion stop and where does the hydrogel begin? That, I think, is the key relevance of that. Is it because if you have nano emulsion, then you're telling me you don't have hydrogel? Because that can't be right, because they're claiming a hydrogel at where you have 1.5% and 3% of lecithin, but then they're admitting that only when you go below 1% do you have no nano emulsion. I think that gets to a dispute between the parties that I think that the court doesn't need to resolve here, but that, to kind of step back a second and answer, I think, the question that Your Honor was getting at, where do we get out of the intrinsic record the two places. One is the fact that more lecithin, more likely to be an emulsion. The second is, if you look in the prosecution history, the- But wait, time out, but it actually encourages you to use, as the most preferred embodiment, less lecithin and have no nano emulsion. Right, less lecithin, no nano emulsion, more lecithin and a nano emulsion that suggests an emulsifier. But if there's no nano emulsion, it's not an emulsifier, right? No, that's not right, Your Honor, because of the way this is, I understand the question. This was extensively debated in the district court as well, but the fact, even if the formulation winds up as a hydrogel, that doesn't mean that there was no role for an emulsifier in preparing this product. In the course of the formulation, it may end up as an emulsifier, as a nano emulsion. You're suggesting that all of, stop, you're suggesting that all these things were disputed. These sound like the sticky, wickedest, little mess of fact findings I can imagine. They found against you. You're up against a deferential standard of review, and if you're telling me that to some extent, whether I say lecithin functions as an emulsifier, turns on whether I am willing to overturn a fact finding below about whether or not when you have no nano emulsion, it's not functioning as an emulsifier, you lose. Respectfully, no, Your Honor, no on the standard of review, and no on what the district court held. This is a question of law, because the district court misallocated the burden, and the district court never made a finding. Misallocated what burden? We're talking about what the function is, function way result. Correct, Your Honor, and while function way result is a factual question, the district court made its factual findings pursuant to a misallocation of the burden. If you look at pages 832 and 833, you will see that the district court held ultimately that it could not rule out the possibility that lecithin might function as a penetration enhancer in this formulation. That is not the same thing as finding that it does, but it was in fact plaintiff's burden to prove that it does. No, it found that it does. It didn't just find. It does have that sentence, which is really unfortunate because it's poorly worded, but the rest of what I read in that opinion seemed to support the idea that they found it to be proven. I respectfully disagree, Your Honor. What page? Page 832 and 833. You begin the last full sentence on page 832. Nonetheless, although plaintiff's position lacks scientific rigor, the court discerns nothing in the record that indicates that lecithin and triglycerides cannot act as penetration enhancers. And this comes out again, first full paragraph on the next page, first sentence, does not exclude the possibility that they function as such in the claimed composition. Yeah, but then they go on on 833, plaintiffs provided testimony from both sides' witnesses to support the common sense proposition. That a given excipient may perform more than one function. It logically follows. That listing them does not mean that the excipients cannot also act as penetration enhancers. I mean, I've looked for a positive statement finding against this, and I did not see one. I'm trying to say the court is also swayed by defendants, your repeated statements in your ANDA that this thing does, in fact, function as a skin penetrator. And that is, yes, that is the closest thing to a boom, Your Honor, but respectfully, that's not. Well, it's a really big boom, and this is a deferential standard of review. The court has made a finding regarding what the function is. He didn't say it might be. This is what he found it was, and then he went on to apply the doctrinal equivalence to that. And your own statements seem like the smoking gun that really doomed you. Well, respectfully, Your Honor, this is statements in our ANDA about our generic product, which does— No, no, these are not statements in your ANDA about your generic product. These are statements in your ANDA about what excipients not used in your product do, and that yours do the same thing as those. Sorry, Your Honor, I was saying this is an ANDA about our generic product. You're right that— These statements are not just about the excipients used in your product. They're about what you understand the excipients—and you have to. You have to say you do the same thing, or you can't get the ANDA. And so you've identified exactly what you believe lecithin and triglyceride do. I mean, did—well, let me ask you, oh my goodness sakes, did you make a misrepresentation? Is this perjury before the FDA? Absolutely not, Your Honor. Respectfully, Your Honor, it's not correct that they have to do the exact same thing where you can't get approval. You have to show that the formulation—  You said they did. You said they did the exact same thing. Our formulation— In the context of this, they have an NDA for this formulation. You said their lecithin, their triglyceride functions as skin enhancers. So does our excipient isopropyl myristate. We were wrong, Your Honor. That apparently is not what they saw their function as. It doesn't matter what they see their function as. That's irrelevant. The question is, what is the function? And the district court made a finding. No, Your—I think, Your Honor, that's an excellent way of pointing it. The question is, what is the function? And if we thought incorrectly that the function was X, that does not make the function Y. And that is what— So do you think that your representations to the FDA were incorrect? We think that— And then have you corrected them? Because it's really important. When you file documents in a federal court that you later discern or a federal agency and you later find that you have made really important, factually erroneous statements, have you corrected them with the FDA? Your Honor, we've told the FDA that our formulation contains— Have you told them that these things don't function as skin penetrators? The FDA knows that, Your Honor, because the Bayer NDA clearly tells the FDA exactly what function— And you came in and told them the opposite. When you make a misstatement of fact to a federal agency, you are obligated to correct it if you later discover your statement is a misstatement of fact. So if you're standing here telling me it's a misstatement, I'm asking you a yes or no question. Have you notified the FDA of your inaccurate representation to them? I believe we are in regular contact— Yes or no? I don't know the answer to the specific question you're asking, Your Honor, because I do not believe that we have failed to carry out any such duty—any duty. Ultimately, this goes to the legal question whether a statement in our NDA can give to the other side's product a function that it does not have, that they did not think that it has. The role that that statement played in this litigation was as one piece of evidence in a pool of various kinds of evidence. This one had a particularly great weight, and it might well have been proven to be incorrect and overcome by other evidence, but the other evidence is kind of iffy in what it says, so this ends up being pretty powerful. Well, I think, Your Honor, that if this evidence is not legally relevant, and if there is no other evidence, or if it's iffy or ambiguous or inequipoise, then we win. It can't be not legally relevant. I think it—respectfully, Your Honor, I think it is not legally relevant whether we concluded that this probably was a penetration enhancer based on the fact that we prepared a generic formulation using isopropyl myristate, which is a penetration enhancer, and we got a bioequivalent result. That was the surmise that we drew, but it's important to note that lecithin and triglycerides, not known to the art as penetration enhancers, and the fact that we made this guess to the FDA does not change the fact that the patent itself— I'm sorry, I didn't hear, which is it, the fact that we made this guess to the FDA? Is that what you—the word used, guess? Yes, Your Honor. That was the best understanding that we could come to about what function this is performing in the brand product. But after we filed our ANDA, after the other side had seen our ANDA, that's when the other side, for the first time, identified its function as penetration enhancement, something not reflected— You're almost out of time altogether. With the indulgence of my colleagues, I'd like to ask you to nonetheless spend a few minutes practicing the prior arguments. Would you refer to that? Sure. Yeah. I think that the district court's legal error on ensnarement is key because the district court applied the wrong hypothetical claim. The district court gave, to use the word this court's cases have used, coverage, extremely broad coverage to this very specific term, lecithin and triglycerides become any penetration enhancer. Yet the district court didn't apply a hypothetical claim that reflects that extremely broad coverage. The correct hypothetical claim would ensnarement. In what way did the district court give extremely broad coverage? I mean, all it did was to make a finding that your particular thing was an equivalent, and in the course of that said, as to the function, there's enough evidence, and I find that it performs this function. It didn't say that all penetration enhancers are now within the scope. On the contrary, if you look at the discussion of way, we had contested whether the formulations could be said, even if they could perform the same function, whether they could be said to do so in the same way. The district court said that it was not going to get into, this is page 838, it was not going to get into particular sub-mechanisms. In other words, it discounted our evidence about way by saying it wasn't going to get into the sub-mechanisms question, but then it didn't apply a hypothetical claim that reflected the breadth of the equivalence theory without consideration of sub-mechanisms that it was applying, and that was the legal error. Well, it said it's not going to get into the sub-mechanisms because the parties both accept that both of these excipients cause disruption of stratum corneum lipids. I don't have the first clue what any of that is, but she then says, and that's sufficient to enhance penetration. And a hypothetical claim directed to that wouldn't snare the prior art, but the district court did not examine that question, Your Honor. This has nothing to do with what the hypothetical claim should be directed to. This has to do with the way in which two particular excipients both operate. If I may answer the question, Your Honor, the scope of the equivalence theory absolutely has everything to do with the breadth of the hypothetical claim. The breadth of the hypothetical claim, the coverage of the hypothetical claim, should reflect the range of equivalence that the plaintiffs are seeking. It does not reflect just the two. They're only seeking an equivalent, as far as I can tell, to isopropyl myristate. The arguments they're making may well extend, as you point out, to other excipients, but they're not asking for coverage of any of those other excipients. They're only asking, and by the way, it's not a claim extension. The Doctrine of Equivalence doesn't extend the claim scope. The claim scope is the claim scope. The Doctrine of Equivalence allows for interchangeable elements to fall within that claim scope. So in any event, they're saying isopropyl myristate. Unless I'm mistaken, I mean, I don't remember them saying all skin penetration enhancers are going to be now within our claims. To quote the Court's decision in Wilson's Sporting Goods, there is no principal difference between isopropyl myristate and the other penetration enhancers. Wilson's Sporting Goods, in the golf ball case, has a quote about isopropyl myristate? Your Honor, the courts in Wilson's Sporting Goods explains how we're supposed to do hypothetical claim analysis. And in Wilson's Sporting Goods, it says the claim said zero dimples on the golf ball can intersect a great circle. And the theory was that 60 dimples on the golf ball intersecting a great circle was equivalent. And so this court said, the hypothetical claim isn't zero or 60. It's zero to 60. It encompasses the entire range, the coverage of the equivalence theory, and there is no principal difference between any point in that range on their theory. If they want to make a broad theory of equivalence, they are stuck with a broad hypothetical claim to ensure that their equivalence theory doesn't ensnare the prior art. This hypothetical claim, the correct hypothetical claim, doesn't ensnare the prior art, which is new and azelaic acid hydrogel with a penetration enhancer. Thank you. We'll restore two minutes of rebuttal. Thank you. Thank you. Good morning. Judge Moore, I think I can answer the question about the FDA correspondence because they are under a court order to update us, and as recently as Wednesday, there's been no representation to the FDA that any representation they made to the FDA is wrong. Now, at trial, we had a five-day trial, one of the witnesses was the Director of Regulatory, Mr. Mafia, and he testified specifically that… His last name is Mafia? Yes. Very good. Keep going. M-A-F-F-I-A is the spelling. You have Dr. Weiner. Maybe I'm mispronouncing it. You have Dr. Weiner and Mr. Mafia. Those are your witnesses. I'm just pointing out the obvious. Go ahead. Okay. Anyway, he gave sworn testimony that all of the statements made to the FDA were accurate, including, and he was specifically asked about this, the statements concerning the penetration enhancing. So, that's the state in the FDA, and of course, the district court relied upon that. I think there was a mountain of evidence to support the function finding. There was the evidence… But there's nothing in the patent that ties lecithin and skin penetration. Nothing in the patent that ties it together. Well, there's no explicit statement, but I think, Judge Boren, as you pointed out, that whole patent is about penetration enhancement. The inventor gave testimony which indicated that those, the lecithin and the triglyceride were there for penetration enhancing, and that example, too. Is that the doctor I referred to? No, no, no. That's the other guy? This is Dr. Franca. Okay, because I was going to say, because I remember the court saying that she rejected Dr. Weiner's testimony because it didn't even appear to know triglycerides were present in something or whatever. Well, that's true. Look, we said this in our brief, and I believe it was a very well-reasoned opinion. We disagreed with that particular finding, but it almost doesn't matter because the evidence was so strong in favor of the function. If you look at their own admissions, and also, the district court's way findings, I think, are particularly appropriate here because they almost dictate, they have conceded the way prong, and they've conceded result. And so, if you look at the way analysis- On appeal. On appeal. Right, yeah. They disputed it before the trial. They did, but not on appeal. And so, their conceding way, and what the district court found there is that there was a very well-reasoned analysis there that the isopropyl myristate, the lecithin, and the disrupt the lipids of the stratum corneum layer. And so, they all function in the same way, and that dictates the function result because what else could they be doing? There was other evidence. There was publication evidence, and so forth. So, there was a lot of evidence to support that finding. But what about his argument, which we only got to near the end, about the fact that for the arguments you make about function way result that otherwise define what you're claiming to be equivalence of your claim elements ought to apply? And you can't have it both ways. You can't say everything that acts as a skin penetrator is going to be an interchangeable equivalent with lecithin and triglycerides, and then say, oh, but for practicing the prior art purposes, we're just going to kind of carve this one out and look at it and say, okay, isopropyl myristate's not in the prior art, so we can have lecithin, triglycerides, and isopropyl myristate without sort of focusing on the function way and result analysis, which is all about skin penetration. Well, I mean, we do not claim that all penetration enhancers fall within the scope of those claims. They have admitted that there's some hundred or more known penetration enhancers. We don't claim all of them. There's a mechanism of action. I think that what the district court found is you just can't mix and match these things. It's very formula dependent, or very formulation dependent. Can I ask you specifically, was your evidence on the way component that all penetration enhancers work in substantially the same way, or that some subclass of which the accused product is a part work in the same way? No, our evidence was not that they all work in the same way, and in fact, the Gasco reference that they rely upon on the ensnarement uses a compound called DMSO. We made the point, and the district court found this, that that's just fundamentally different than the three penetration enhancers at issue here, which focus on the lipid. They disrupt the lipids of the skin, not the protein, so DMSO also has an impact on the protein. They're in different classes, the district court found, and these penetration enhancers are in different classes based on their chemistry and based on the impact they have in the skin. And so no, the evidence was very specific as to this type, this class. Is it your view that as a matter of law, the hypothetical claim can only be broadened just enough to cover the accused product? Yes. And what's the support for that? Just enough and no more? Than to cover the accused product? Well, I think our reading of Wilson Sporting Goods, for example, and Pew Spine is that you need to cover it. It wouldn't be fair, in my view, to extend it beyond what you're trying to cover on equivalence. Now, a range case— They're two separate things, whether you need to cover it and whether you can extend it beyond coverage of the accused product. So are you reading the cases to say, no, it can't be broadened any more than just enough to cover the accused product because they're different things? Yes, Your Honor. That's the way we read the cases. And nor do I think it would be fair to extend beyond what we're asking for. It doesn't— And that doesn't preclude you, though, from asking for more, right? You can come back for seconds in another case. Isopropyl myristate in this instance, and if I could think of a name of any other chemical or ever new one, I might throw it out now, but I don't. That's all I've got for you. So maybe there's some— You just said there's hundreds of possible ones. So next case, you could go after a different one, right? So how are they to know in formulating— I mean, it's not a terrible thing for the market to have competition, and so how are they to know what excipients are, in fact, fair game going forward? Because the whole point of patents is notice. So now that we've all kind of gotten down to the idea that there are possibly 100 excipients that could function as skin penetrators, and you're saying some of them might not fall within these claims because they operate in a different way, how do they go ahead and figure out how to compete? Well, I think, first of all, we have a record in the case, right? We've taken certain positions, but I think that we'd analyze another case the same way we analyze this one. We'd take a look at that particular chemical, see how it— what the way was, and determine whether it functioned in the same way. I think it's pretty clear that we have taken a position that DMSO, for example, doesn't function in the same way. So if they had another excipient, not isopropyl myristate, that functioned in the same way but was present in the prior art, you wouldn't go after that one because it's present in the prior art, right? Well, I wouldn't say that, Judge Moore. I think that it would depend, right? The doctrine of equivalence is a function-way-result analysis. You'd have to have the same result. All of these things are in the prior art somewhere, right? And so it's just a matter of putting them together. But the point of the exception is it's after you've already established function-way-result, right? I mean, you don't get to practicing the prior art unless you've already established a primifacia case of infringement under DOE. It's an exception to DOE. So you have another excipient, another random excipient, same formulation, but rather instead of isopropyl myristate, they choose a different excipient. And if it operates in the same function-way-result but is nonetheless present in the prior art, are you going after it or are you not going after it for infringement? I'm not sure I can answer that question because it's a hypothetical. It would depend on what the function-way-result shows. You have to answer judges' hypotheticals. No, but I don't know how to answer a hypothetical. You don't have to answer a hypothetical. No, no, no, no. I'm not saying I don't have to. That's not what I'm saying. All I'm saying is I don't know how to answer a hypothetical without facts. And so if you gave... I thought I gave a couple of those. There's another excipient that is identical in function-way-result to lecithin and triglycerides exactly the same way isopropyl myristate is. And that other excipient happens to be present in the prior art. All right, so if there's another excipient, under the hypothetical claim, it still would not anticipate or render obvious because GASCO, the reference they used, was not a hydrogel. Okay, so you're saying it would... I got news for you. If there's prior art that's a hydrogel and it's azelaic acid and it's an excipient, you're frigging invalid. I mean, that's the end of that. Forget about practicing the prior art. So where is that line? Because practicing the prior art means something, right? There is some universe of things which are encompassed by it, like that golf ball and Wilson's sporting goods. So what I mean, I guess what I'm trying to figure out is really what I'm trying to get at with all of this is how broad should the hypothetical claim be drafted? Because if you're going to go after every single skin penetrator, just like isopropyl myristate, then we ought to probably be thinking about that, right, when we're drafting that hypothetical claim. If your argument is every single skin penetration enhancer that functions in this way, every single one of them is within the scope of what we ought to be able to sue for infringement for DOE purposes, and that is, to some extent, the nature of your argument on function waiver assault, then why is that not, as your colleague on the other side says, exactly the way we ought to be thinking when we're drafting the hypothetical claim? Well, my answer to that would be we're not going after everyone. And again... In this particular case. That's why I was trying to figure out where else it's going. But even in future cases, Judge Moore, I mean, you know, the reason I commented before that way is because it depends on a particular recipient. If it functions in the same way, that would be consideration number one. If it gives the same result, that would be consideration number two. And so before you decided to bring another case, you'd have to look at both the way and the result. Does it give the same unexpected properties that the claim formulation gives? And I think you'd have to look at that whole thing before you decide to give a case. But I can say unequivocally, nobody would have an intention of bringing a case on every penetration enhancer that people know about. That just wouldn't happen. No, but I'm just trying to figure out how to craft the hypothetical claim. Suppose isopropyl myristate has a brother. I don't even know what we'll call him, but he's got a brother. They're identical. Everybody knows these two are actually interchangeable. And suppose the brother of isopropyl myristate is disclosed in the prior art, such that if you were trying to assert your claims against a composition with not isopropyl myristate, but rather with its brother, that it would fall within the practicing the prior art issue. That would absolutely thwart you from doing so. Do you understand my hypothetical this time? Yes. So then why should you be able to claim isopropyl myristate if it's exactly like this other one? I mean, in function, way, and result, they're identical. Why should you be able to go after under the doctrine of equivalence? Why aren't we considering whether or not isopropyl myristate is more like what's in the prior art when we're drafting that hypothetical claim? Well, it may be that if something's very, very similar to isopropyl myristate and we get the same result, that that would be a case that we would bring. But I don't know that anything like that exists. And I think we're dealing in a lot of hypotheticals or speculation that may not exist. And I understand, Judge Moore, your question. You want to know. The problem is we've got to come up with a hypothetical claim. And so I'm in a universe where we actually have to come up with a hypothetical claim. Well, what I would suggest is that for the purposes of this case, we leave the hypothetical claims the district court concluded. And if there's another case, then the court deals with that particular case. And do you think then that this is just different than ranges? So let me ask you. Suppose that your claim covers 0% to 15% of lecithin. And you want to go after someone under the doctrine of equivalence who's outside that range and he's at 18%. Suppose the prior art discloses 16% and 17%. Do you think it would be proper for your hypothetical claim, should it have to be, you'd have to fight the hypothetical claim from 0% to 18%? Or could you fight 0% to 15% and 18% with a hole in the middle for 16% and 17%? No, no, no. On a range, I agree. If there's a range, and there were range cases that they cited. There was one range case, 5 to 25. And then the equivalent was 29.3. I agree in a range case, you go straight through to the range. But this is different because we have particular species that we're dealing with. And so, but range cases, I think, are distinguishable. But I agree with you on how you'd analyze that. OK. Nothing further. Thank you. Two minutes. Thank you, Your Honor. I want to emphasize that it's the other side's burden, the plaintiff's burden, to prove that the correct hypothetical claim does not ensnare the prior art. And my friend said that the district court made a finding that DMSO, which is in the prior art, is different. It works differently than isopropyl myristate. Respectfully, there is no such finding. If you look at page A44 to A45, that's where the district court discusses DMSO. And what it's discussing is whether you would swap isopropyl myristate, whether you'd swap lecithin and triglycerides for DMSO. And the court says no, at least in part, because lecithin and triglycerides were not known penetration enhancers. However, if you look at two things, 3197 of the appendix is the testimony of our expert that they're in the same class of chemical penetration enhancers. And 5579 to 80 is a paper named Barry, which refers to DMSO having an effect on the stratum corneum lipids. Ultimately, we don't have to prove this. The other side had to prove that a correct hypothetical claim would not ensnare the prior art. And I think that the colloquy with Judge Moore is really quite revealing, and it illustrates the problem that my friend's view of hypothetical claims would have for a generic trying, conscientiously, to design around this very specific patented formulation that apparently, according to my friend, even a penetration enhancer that is in the prior art would not be safe if it was equivalent to the very specific excipients that they're claiming in this formulation. Can I just, tell me if I'm understanding the way that the arguments are being presented to us. The district court said the appropriate hypothetical claim is just put in isopropyl myristrate. You say no, the appropriate hypothetical claim is any penetration enhancer that leaves out a potential significant middle. And you don't make any argument that if there is a narrower theory of equivalence like amphiphilic water soluble, that that would ensnare the prior art. You just don't make an argument like that. And their testimony, and in particular their post-trial brief, rather strongly emphasized, I think at pages 29 and 30 of their post-trial brief, those features that are shared by your isopropyl myristrate and the lecithin. They didn't say that anything that would be a penetration enhancer would do it. But you haven't made an argument about that being an insufficient hypothetical. We do think that anything like what they advanced would ensnare DMSO and would therefore be invalid. And the two appendix references that I just gave your honor would do that. Our submission is that the district court used the wrong hypothetical claim, so it never resolved any of this. Their argument about amphiphilic combined with water insolubility would, I think, not ensnare DMSO because DMSO, I think, isn't the testimony highly water soluble. I believe that that's right. That DMSO is not itself amphiphilic. But I don't believe that that's the theory that they, in fact, advance. I mean, for their hypothetical claim, nor did the district court resolve it. I mean, I think that the best illustration of this is the hypothetical claim used in Ultratex in which the court did not take, and I believe this was conceded, the claim said wax coated and the alleged equivalent was polymer coated or polyethylene coated, but the hypothetical claim said waterproof. And I think that illustrates exactly what we're getting at here. What is the equivalence theory? Thank you. We thank both sides. The case is submitted.